U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

DEC 2 7 2007

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY
SHREVEPORT

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

CLAIBORNE ELECTRIC
COOPERATIVE, INC.

versus                                    CIVIL ACTION NO. 05-0166
                                          JUDGE TOM STAGG

SOUTHWESTERN ELECTRIC
POWER CO.

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendant,

Southwestern Electric Power Company ("SWEPCO").  See  Record Document 21.

For the reasons set forth below, SWEPCO's motion for summary judgment is

**DISMISSED** for lack of subject matter jurisdiction.

## I. BACKGROUND

In 1994, Cajun Electric Power Cooperative ("Cajun"), a Louisiana electric

generating and transmitting cooperative, filed for bankruptcy under Chapter 11 of the

Bankruptcy Code.  After Cajun filed its bankruptcy petition, certain electric

"distribution" cooperatives joined together and formed an unofficial committee centered around their anticipated common goals with respect to the Cajun bankruptcy. This unofficial committee became known in the Cajun bankruptcy proceedings as the "Members Committee." After certain cooperatives withdrew from the Members Committee, the group became know as the "Committee of Certain Members" ("CCM"). Although an electric distribution cooperative, Claiborne Electric Cooperative, Inc. ("Claiborne") did not join the committee, instead preferring to maintain its independence in the Cajun bankruptcy proceedings.

As the Cajun bankruptcy proceedings progressed, it became apparent that Cajun likely would be liquidated and its assets sold to the highest bidder. Competing bankruptcy plans were drafted, including one by SWEPCO. After lengthy litigation and the incurrence of substantial expenses by all parties, Claiborne decided to support SWEPCO's plan for reorganization. To that end, Claiborne signed an agreement ("Term Sheet") with SWEPCO in 1997 which stated, among other things, that in the event the SWEPCO plan was adopted, SWEPCO agreed to reimburse Claiborne its reasonable bankruptcy litigation and expert/consultant expenses up to $500,000. Further, the Term Sheet specified that any amendments to the "Joint Plan," as the

2

SWEPCO/Claiborne plan was called, had to be in writing. The Term Sheet was filed with the bankruptcy court.

Two years later, in 1999, SWEPCO, Claiborne, and various other electric cooperatives entered into another agreement, subject to court approval, regarding power supply and reimbursement of litigation expenses. This agreement was incorporated into the "Revised Supplemental Disclosure Statement in Support of the Joint Plan of Reorganization," which was filed with the bankruptcy court.[1] Pursuant to this agreement, SWEPCO would reimburse Claiborne's legal fees and expenses up to $1.5 million if the Joint Plan was confirmed. However, SWEPCO would have no obligation to reimburse Claiborne for fees and expenses incurred after either the confirmation of another plan of reorganization or the denial of confirmation of the Joint Plan. In addition, SWEPCO also agreed to reimburse CCM fifty percent of the reasonable legal fees and expenses incurred in supporting the Joint Plan since January 1, 1997.

On August 18, 1999, District Judge Frank J. Polozola ordered a settlement

---

[1] In 1996, SWEPCO filed a "Supplemental Disclosure Statement" with the bankruptcy court outlining its proposed plan for reorganization of Cajun. This plan was signed by Claiborne, but it did not address the issue of reimbursement of litigation costs and expenses.

3

conference in the Cajun bankruptcy case. All parties to the bankruptcy proceeding appeared in federal district court in Baton Rouge on August 25, 1999, pursuant to that order. The parties eventually reached a comprehensive settlement agreement in court. All competing bankruptcy plans, including SWEPCO's, were withdrawn, and a plan proposed by another electric company was confirmed. The settlement also addressed the issue of reimbursement of the costs and expenses of the electric cooperatives in this lengthy litigation.

Claiborne claims that in its discussions with SWEPCO during the settlement conference, SWEPCO's representatives verbally assured Claiborne's counsel and then general manager that Claiborne would be treated the same as those cooperatives that were members of the CCM. See Record Document 26 at 5. Based on this conversation, Claiborne believed that SWEPCO would reimburse Claiborne for all remaining expenses after reimbursement by the Cajun estate in the same proportion as it was obligated to reimburse the members of CCM. SWEPCO neither admits nor denies that such a conversation took place, but claims that no such agreement was made between SWEPCO and Claiborne. The court did not take notice of this alleged verbal agreement. Pursuant to the comprehensive settlement agreement, the electric

4

cooperatives, including Claiborne, received a total of $12.9 million in cost reimbursement, and SWEPCO received $1,364,547.36 in cost reimbursement. This settlement was incorporated into a written settlement agreement, which was signed by all parties on August 26, 1999. The court subsequently issued a confirmation order  confirming the agreed upon plan for reorganization.

After the Cajun bankruptcy case was settled, Claiborne filed the instant suit in state court alleging that the defendant, SWEPCO, breached its contract with Claiborne by failing to reimburse Claiborne for the remaining expenses to the same degree as it agreed to reimburse the members of the CCM. Claiborne seeks damages for breach of contract as well as recovery of fifty percent of its litigation costs and expenses incurred during the Cajun bankruptcy proceeding. After removing the case to this court,[2] SWEPCO  filed a motion for summary judgment, arguing that because a binding agreement was not reached between the parties regarding the alleged reimbursement obligation and because the settlement agreement reached in the Cajun bankruptcy proceeding is controlling on the issue of reimbursement, the case should be dismissed.  See Record Document 21.  Additionally, the parties filed a joint

---

[2]SWEPCO filed a notice of removal in this case on January 27, 2005.

5

stipulation regarding the facts of this case.  See Record Document 24.  Finally, in

response to an order by this court, both parties filed briefs in support of subject matter

jurisdiction.  See Record Documents 29 and 30.

## II.  LAW & ANALYSIS

**A.    Jurisdiction**.

According to the Fifth Circuit, "federal trial and appellate courts have the duty

to examine the basis for their subject matter jurisdiction, doing so on their own

motion if necessary."  Torres v. S. Peru Copper Corp., 113 F.3d 540, 542 (5th Cir.

1997).  Additionally, "[a]s a bedrock principle of federal jurisdiction, a court may sua

sponte review whether subject matter jurisdiction exists in a case." Preston v. Tenet

Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 812 n.2 (5th Cir. 2007).

Therefore, although neither party challenged the jurisdiction of this court in this case,

it is proper that this court examine it of its own accord.

In general, a case may be removed from state to federal court if the federal

court would have original jurisdiction over the proceeding.  See 28 U.S.C. § 1441.

Claims that are related to bankruptcy cases may be removed to federal district court

if the district court has jurisdiction over the case under 28 U.S.C. § 1334.  See 28

U.S.C. § 1452. Pursuant to 28 U.S.C. § 1334(b), "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[3]

Although the statute does not define "related to" jurisdiction, the Fifth Circuit has held that a matter is "related to" a title 11 case if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy."[4] Matter of Wood, 825 F.2d 90, 93 (5th Cir. 1987) (emphasis in original) (quotations omitted). The court further explained that a proceeding is related to a title 11 case "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and ... in any way impacts upon the handling and administration of the bankrupt estate." Zale v. Feld, 62 F.3d 746, 753 (5th Cir. 1995) (citations and quotations omitted). Thus, for jurisdiction to exist, the proceedings must have some effect on the debtor. See Celotex Corp. v. Edwards, 514 U.S. 300,

---

[3]As noted by the Fifth Circuit, "it is not necessary to distinguish between proceedings 'arising under', 'arising in a case under', or 'related to a case under', title 11. These references operate conjunctively to define the scope of jurisdiction. Therefore, it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." Matter of Wood, 825 F.2d 90, 93 (5th Cir. 1987).

[4]The First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have all adopted this test originally set out in Pacor, Inc. v. Higgins, 743 F.2d 984 (3rd Cir. 1984).

7

308 n.6, 115 S.Ct. 1493, 1499 n.6 (1995).

In the instant case, the bankrupt estate in question is that of Cajun. Therefore, the question becomes whether the outcome of this proceeding could conceivably have any effect on the Cajun bankrupt estate. The court has determined that the outcome of this dispute could not conceivably affect the Cajun bankrupt estate. First, regardless of whether the court upheld the verbal agreement regarding reimbursement or found that no such agreement existed, the result would in no way alter the *Cajun* bankrupt estate. Second, SWEPCO specifically stated in its memorandum in support of its motion for summary judgment that in signing the Settlement Agreement, no party reserved any rights "to seek additional costs and fees whatsoever." Record Document 21, Attachment 1 at 5-6. Thus, because Claiborne and SWEPCO both signed the Settlement Agreement, they specifically relinquished any rights to seek additional funds from Cajun.

Third, in its memorandum in support of subject matter jurisdiction, SWEPCO claims that if the settlement reached in the Cajun bankruptcy were not res judicata, precluding Claiborne's current claim, then "SWEPCO would not have accepted lesser sums, and the estate could have certainly been adversely affected, in light of ongoing

8

litigation, increasing expenses, and the possible reimbursement of even more expenses as costs increased."[5]  Record Document 29 at 6-7.  However, this did not happen, nor will it since the Settlement Agreement has been signed by both parties with neither one reserving any of these rights.  Moreover, while SWEPCO repeatedly states that the Cajun estate could conceivably be affected by the outcome of this proceeding, it never explains *how* or *in what ways* the Cajun estate could be affected.

In sum, the court finds that any outcome of this proceeding would in no way alter Cajun's rights, liabilities, options, or freedom of action (either positively or negatively) or in any way impact the handling and administration of the Cajun bankrupt estate.  See  Zale, 62 F.3d at 753 (5th Cir. 1995).  This court, therefore, lacks jurisdiction to consider this claim because the proceedings before the court have no effect on the debtor, Cajun.  As such, SWEPCO's motion for summary judgment is dismissed.

## III. CONCLUSION

Based on the foregoing analysis, this court lacks subject matter jurisdiction

---

[5]Claiborne also filed a brief in support of subject matter jurisdiction.  However, Claiborne made no additional arguments and stated only that it agreed with those set forth in SWEPCO's brief.  See Record Document 30.

9

over this claim.  Pursuant to 28 U.S.C. § 1447(c), this case is hereby **REMANDED**

to the Second Judicial District Court, Claiborne Parish, Louisiana.

An order consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 27th day of

December, 2007.

JUDGE TOM STAGG

10